Maynard L. **GRAFFAM** et al.

v.

Daniel E. **WRAY** et al.

Maynard L. **GRAFFAM** et al.

v.

Donald H. **WHITNEY** et al.

Supreme Judicial Court of Maine.

Argued Sept. 2, 1980.

Decided Dec. 2, 1981.

J. Armand Gendron (orally), Sanford, for plaintiffs.

Sheldon D. Skolfield (orally), Portland, for defendants.

Before McKUSICK, C.J., and WER-NICK *, GODFREY, NICHOLS, GLASS-MAN **, and ROBERTS, JJ.

NICHOLS, Justice.

These consolidated appeals arise out of a schismatic dispute within the Congregational Church of Limington, Maine, over the control of church funds and property.

Cognizant though we are of the wall of separation between church and state, erected by our organic law [1], we recognize that there are certain circumstances where the courts may intervene in church schisms which affect church property. The cases at bar present such an occasion.[2]

A dispute between two groups of members within the unincorporated Congregational Church of Limington resulted in the call of a special church meeting on October 3, 1977, to vote on whether the pastor, Daniel Wray, should be dismissed. Presiding as moderator of that meeting pursuant to a church by-law which provides that "[t]he Minister shall be the standing moderator of the church, presiding unless obviously improper," Pastor Wray overruled an objection to his retention of the chair. No appeal was taken from his ruling although parliamentary rules so permitted.

At this meeting a second motion was made to "debar" 23 church members from voting, in accordance with the Limington Church Manual which states: "Members habitually neglecting the services of the church without approved excuse may be debarred from voting." This motion carried. A third motion was made and carried by the congregation then voting to remove Deacon Horace Hogle from office for having committed a "breach of faith." Several church officers including the acting treasurer then resigned. The meeting was adjourned without having considered the pastor's dismissal.

The following Sunday, October 9, 1977, from the pulpit Pastor Wray called a special meeting to fill the vacant church offices of clerk and treasurer. At this meeting Donald Whitney was elected from the church membership to serve temporarily as treasurer. On December 2, 1977, certain church members instituted one of these suits seeking injunctive relief to restrain Treasurer Whitney from withdrawing church funds held by several banks.

Meanwhile, on January 2, 1978, upon due notice the annual church meeting was held. Pastor Wray, again serving as moderator, called a point of order, stating that the meeting would not proceed until all "nonmembers" present vacated the premises. Upon their refusal to leave, Wray adjourned the meeting sua sponte and departed with his adherents. The dissident mem-

---

* WERNICK, J., sat at oral argument and participated in the initial conference but retired before the opinion was adopted.

** GLASSMAN, J., sat at oral argument and participated in the initial conference but died before the opinion was adopted.

1. The Declaration of Rights of the Maine Constitution ordains:

All men have a natural and unalienable right to worship Almighty God according to the dictates of their own consciences, and no one shall be hurt, molested or restrained in his person, liberty or estate for worshipping God in the manner and season most agreeable to the dictates of his own conscience, nor for his religious professions or sentiments, provided he does not disturb the public peace, nor obstruct others in their religious worship; —and all persons demeaning themselves peaceably, as good members of the state, shall be equally under the protection of the laws, and no subordina-

tion nor preference of any one sect or denomination to another shall ever be established by law, nor shall any religious test be required as a qualification for any office or trust, under this State; and all religious societies in this State, whether incorporate or unincorporate, shall at all times have the exclusive right of electing their public teachers, and contracting with them for their support and maintenance. Me. Const. art. I, § 3.

In similar vein the United States Constitution provides:

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; .... U.S.Const. amend. I.

2. In circumstances which demand judicial intervention we echo the exclamation of the Psalmist David, "Behold, how good and how pleasant it is for brethren to dwell together in unity!" Psalms 133:1 (King James).

bers remained and proceeded to elect their own slate of officers for the 1978 church year.

Four weeks later, the Sunday church bulletin of January 29, 1978, contained the following announcement:

As previously announced to all active members in good standing, there will be a congregational meeting following this morning's service of worship. Because there has been no final resolution of the current suit, no member who participated in the illegal meeting on January 2 will be permitted to participate in today's meeting.

At this meeting, again presided over by Pastor Wray, the active congregation elected its slate of officers and approved the church budget.

On April 4, 1978, the Plaintiffs in the December action instituted the second of these suits, seeking a declaratory judgment naming the true officers for the 1978 church year. They further requested injunctive relief, demanding *inter alia* that the officers "purportedly" elected at the January 29 meeting be made to account for their handling of church funds during the period of their tenure as "de facto" officers.

Due to procedural problems and several attempts to agree on referees, the consolidated actions[3] were not tried in a non-jury proceeding until February 1 and 2, 1979. On July 1, 1979, the Superior Court dismissed the second suit for lack of subject-matter jurisdiction. Final judgment in the earlier action, granting the Plaintiffs permanent injunctive relief, was not entered until March 17, 1980, following our remand after a purported appeal for failure of the Superior Court to enter a final judgment.

In the meantime, at a duly called annual meeting held on January 29, 1980, a full slate of officers was elected for the 1980 church year, including James Glasgow as the new treasurer. Prior to final adjudication of the earlier action, the Defendants, on February 6, 1980, moved to dissolve the injunction on grounds that Donald Whitney

was no longer the treasurer. This motion was denied, and the permanent injunction enjoining Whitney from withdrawing any church funds from any bank was entered in the earlier action as a final judgment on March 17, 1980.

Both the Plaintiffs and the Defendants appeal from the judgment granting permanent injunctive relief in the earlier action. For the reasons stated below, we dismiss both the appeal and the cross-appeal as moot. The Plaintiffs also appeal from the Superior Court's dismissal of the second suit. We sustain this appeal and remand for proceedings consistent with this opinion.

### The Earlier Action

As previously noted, on March 17, 1980, final judgment in the form of permanent injunctive relief was rendered in CV–77–577. The "order of judgment" specified in pertinent part:

Defendant Donald H. Whitney, alleged treasurer of the Congregational Church of Limington, be and hereby is permanently enjoined from withdrawing or attempting to withdraw any funds of said Church from any bank or depository thereof, from dealing as such alleged treasurer with any funds of said Church, from otherwise disposing or attempting to dispose of any property of said Church, including but without exclusion any monies or securities which are the property of said Church, except by further order of this Court . . . .

The order further stated:

The reason for the issuance of this injunction is that said Donald H. Whitney has been found by the Court in this action, as claimed by the plaintiffs, not to be the duly elected treasurer of said Church.

On January 29, 1980, an annual meeting for the election of church officers was held and supervised by an executive committee for the Maine Association of Congregational-Christian and Community Churches, of which the Limington Church was a mem-

---

**3.** The action commenced in December, 1977, was assigned Docket No. CV–77–577, and the action commenced in April, 1978, was assigned Docket No. CV–78–178.

ber. At this meeting a full slate of officers was elected, including James Glasgow as the church treasurer.[4]

The Defendants argue that the issue concerning the election of Donald Whitney as church treasurer at the October 9, 1977, meeting is mooted by way of the uncontroverted election of officers for 1980.

We agree.

■■■ It is a fundamental principle of appellate review that courts will not consider an appeal that has become moot except in the most extraordinary of circumstances. *State v. Gleason*, Me., 404 A.2d 573, 578 (1979); *Cote v. Zoning Board of Appeals*, Me., 398 A.2d 419, 420 (1979); *Hazzard v. Westview Golf Club, Inc.*, Me., 217 A.2d 217, 224 (1966). Mootness exists when there is no longer a controversy between the parties due to intervening circumstances. *Cote, supra* at 420. The underlying policy for the mootness doctrine has been said to be the preservation of flexibility in the law by not creating unnecessary precedent, as well as considerations of judicial economy. *E.g., Taylor v. Commissioner of Mental Health & Corrections*, Me., 431 A.2d 1304, 1306 (1981); *see also* Note, 88 Harv.L.Rev. 373, 375–76 (1974). We have also declared that where a decision by our Court would not afford the appellant any effective relief, we will dismiss the appeal on the ground of mootness for purposes of judicial economy. *Knowlton v. Rhodes*, Me., 413 A.2d 546, 548 (1980).

■■■ As a result of the supervening election of James Glasgow as Limington Church Treasurer for 1980, the controversy rising from the order of judgment permanently enjoining Donald Whitney from withdrawing church funds no longer exists. We cannot say that this case has "remained alive" throughout the course of litigation so as to sustain our jurisdiction at this stage of the proceedings. *See Marden v. International Association of Machinists and Aerospace Workers*, 576 F.2d 576, 581 (5th Cir.

1978); C. Wright, A. Miller & E. Cooper, 13 *Federal Practice and Procedure* § 3533, at 263, 292–93 (1975). Accordingly, we dismiss the appeal and cross-appeal of CV–77–577 as moot.

### The Second Suit

At the annual meeting on January 29, 1978, officers were elected and a budget approved for the 1978 church year. Only the Defendants were in attendance at this meeting. The legal significance of this meeting was the critical issue arising from the Plaintiffs' complaint in CV–78–178, seeking declaratory judgment for, *inter alia*, an accounting and reimbursement of monies alleged to have been wrongfully appropriated by the Defendants.

We hold that the Superior Court's dismissal of this case for lack of subject matter jurisdiction on grounds that the meeting dealt solely with ecclesiastical affairs, constituted error.

For centuries judicial tribunals have been reluctant to intervene in controversies arising out of religious disputes. Likewise, the trial courts have been cautioned repeatedly not to delve into the resolution of ecclesiastical doctrinal controversies. *See Protestant Episcopal Church in the Diocese of New Jersey v. Graves*, 83 N.J. 572, 576, 417 A.2d 19, 22 (1980), *cert. denied*, 449 U.S. 1131, 101 S.Ct. 954, 67 L.Ed.2d 119 (1981).

■ Disputes over church property, however, may be resolved in the civil courts. As stated by the Supreme Court of the United States in *Presbyterian Church in the United States v. Mary Elizabeth Blue Hull Presbyterian Church*, 393 U.S. 440, 449, 89 S.Ct. 601, 606, 21 L.Ed.2d 658 (1969), "Civil courts do not inhibit free exercise of religion merely by opening their doors to disputes involving church property. And there are neutral principles of law, developed for use in all property disputes, which can be applied without 'establishing' churches to which property is awarded." In

---

4. We also note that this committee conducted an investigation and concluded that the active members of the church had been conducting business in good order according to their bylaws.

settling such disputes, however, the courts must not inquire into the underlying controversies over religious doctrine which may have led to the dispute.

Historically, most courts have resolved church property disputes by following the guidelines of *Watson v. Jones,* 80 U.S. (13 Wall.) 679, 20 L.Ed. 666 (1872).[5] That landmark case established three rules governing disputes concerning church property, the second of which is germane to the controversy before us:

> The second class of cases which we have described has reference to the case of a church of a strictly congregational or independent organization, governed solely within itself, either by a majority of its members or by such other local organism as it may have instituted for the purpose of ecclesiastical government; and to property held by such a church, either by way of purchase or donation, with no other specific trust attached to it in the hands of the church than that it is for the use of that congregation as a religious society.

> In such cases, where there is a schism which leads to a separation into distinct and conflicting bodies, *the rights of such bodies to the use of the property must be determined by the ordinary principles which govern voluntary associations.* If the principle of government in such cases is that the majority rules, then the numerical majority of members must control the right to the use of the property. If there be within the congregation officers in whom are vested the powers of such control, then those who adhere to the acknowledged organism by which the body is governed are entitled to the use of the property. The minority in choosing to separate themselves into a distinct body, and refusing to recognize the authority of the governing body, can claim no rights in the property from the fact that they had once been members of the church or congregation.

> 80 U.S. (13 Wall.) at 724–25 (emphasis added).

Thus, by way of this dictum, it became advisable to consider the polity or form of government of the particular church denomination when addressing questions involving use or control of church property.[6]

The polity of the Congregational Church of Limington is, as the name implies, of the congregational, self-governing form, and not hierarchical. As such, there is no binding ecclesiastical authority, and the church is not required to subscribe to any particular creed or program. *See* F. Meads, *Handbook of Denominations in the United States,* 113–14 (6th ed. 1975).

In 1871 the National Council of Congregational churches adopted a constitution providing in part here pertinent:

> The Congregational churches of the United States . . . agree in the belief that the right of government resides in the local churches, or congregations of believers . . . .

The constitution went on to state:

> The churches . . . while establishing this National Council for the furtherance of the common interests and work of all the churches, do maintain the Scriptural and inalienable right of each church to self-government and administration; and

---

**5.** *See generally* Note, *Constitutional Guidelines for Civil Court Resolution of Property Disputes Arising From Religious Schism,* 45 Mo.L.Rev. 518, 520 (1980); Ellman, *Driven From the Tribunal: Judicial Resolution of Internal Church Disputes,* 69 Cal.L.Rev. 1378 (1981).

**6.** Three general categories of church polity have been defined in Note, *Judicial Intervention in Disputes Over the Use of Church Property,* 75 Harv.L.Rev. 1142, 1143–44 (1962) as follows:

At least three kinds of internal structure, or "polity," may be discerned: congregational, presbyterial, and episcopal. In the congregational form each local congregation is self-governing. The presbyterial polities are representative, authority being exercised by laymen and ministers organized in an ascending succession of judicatories—presbytery over the session of the local church, synod over presbytery, and general assembly over all. In the episcopal form power reposes in clerical superiors, such as bishops. Roughly, presbyterial and episcopal polities may be considered hierarchical, as opposed to congregational polities, in which the autonomy of the local congregation is the central principle. (Footnotes omitted).

this National Council shall never exercise legislative or judicial authority, nor consent to act as a council of reference.

In W. Walker, *History of the Congregational Churches in the United States,* 434 (6th ed. 1907), the Congregational church is described as a self-governing free church, under the dominance of no other ecclesiastical organization or person. Accordingly, the "Manual of the Congregational Church of Limington" specifies that the Limington church claims the right to direct its affairs independently of all outward authority or control.

█ Whether involving a congregational church or a hierarchical church, where the internal dispute concerns primarily religious doctrine, church polity or organization, and only incidentally affects church property or other secular matters, the civil courts must defer to the acting ecclesiastical authorities. In hierarchical churches this means respecting the decision of the highest "court" of the hierarchical church organization. *Serbian Orthodox Diocese v. Milivojevich,* 426 U.S. 696, 724–25, 96 S.Ct. 2372, 2387–88, 49 L.Ed.2d 151 (1976). In congregational churches this results in accepting the decision of the self-determining mechanism of the autonomous congregational organization. *Protestant Episcopal Church, supra* 417 A.2d at 22; *Crumbley v. Solomon,* 243 Ga. 343, 254 S.E.2d 330 (1979).

Where, however, the civil courts are asked to intervene in answering *church property questions,* the Supreme Court of the United States has recently indicated that States are free to adopt any approach to adjudicate such disputes "so long as it involves no consideration of doctrinal matters, whether the ritual and liturgy of worship or the tenets of faith." *Jones v. Wolf,* 443 U.S. 595, 602, 99 S.Ct. 3020, 3025, 61 L.Ed.2d 775 (1979), *quoting, Maryland &*

*Virginia Eldership of the Churches of God v. Church of God at Sharpsburg, Inc.,* 396 U.S. 367, 368, 90 S.Ct. 499, 500, 24 L.Ed.2d 582 (1970) (Brennan, J., concurring). Professor Tribe emphasizes that the civil courts have a "duty" to avoid underlying religious issues in adjudicating church disputes concerning the use or control of church property. L. Tribe, *American Constitutional Law* § 14–12 at 879 (1978).

In *Jones v. Wolf,* the United States Supreme Court, in a five to four decision, refused to require state courts to defer to the decision of the appropriate ecclesiastical tribunal in all disputes concerning control of church property. Although *Jones* involved a schism within the membership of a hierarchical church, we read that decision as summarizing basic guidelines which we should follow in resolving property questions in *both* congregational *and* hierarchical church property disputes.

█ *Jones* established a two-tier constitutional test which the states must adhere to in choosing *any* method for resolving church property disputes.[7] First, civil courts are prohibited by the First Amendment from resolving church property disputes on the basis of religious doctrine and practice. 443 U.S. at 602, 99 S.Ct. at 3025. The second basic requirement, as we have previously noted, is that a state may adopt *any* approach for settling church property disputes so long as *no* considerations of doctrinal matters are involved. *Id.* at 602, 99 S.Ct. at 3025. One such method is what has generally been referred to as the "neutral principles" approach. The *Jones* court specifically stated that "a State is constitutionally entitled to adopt neutral principles of law as a means of adjudicating a church property dispute." *Id.* at 604, 99 S.Ct. at 3026.[8]

---

**7.** For discussion concerning the impact of *Jones v. Wolf, see generally* Note, *Judicial Resolution of Church Property Disputes,* 31 Ala.L. Rev. 307 (1980); Note, *Jones v. Wolf: Neutral Principles Standard of Review for Intra-Church Disputes,* 13 Loy.L.Rev. 109 (1979); Note, *Constitutional Guidelines for Civil Court Resolution of Property Disputes Arising from Religious*

*Schism,* 45 Mo.L.Rev. 518 (1980); Comment, *Constitutional Law: Neutral Principles of Law and Majority Rule Presumption Applied in Disputes Over Church Property,* 19 Washburn L.J. 590 (1980).

**8.** *Jones* does not *require* the States to adopt the "neutral principles" approach. A State can adopt a rebuttable presumption of majority

A Maine case addressing the question of legal ownership of church property is *Bangor Spiritualist Church, Inc. v. Littlefield*, Me., 330 A.2d 793 (1975), involving action by a church to recover money allegedly withdrawn from a bank without authority. In dictum we observed:

> Since we are not required in this case to resolve any ecclesiastical issues that may exist between the litigants but are confronted only with the question of the legal ownership of funds, we have no hesitancy in holding that this controversy is properly before us, our decision being controlled entirely by neutral principles of law. *Id.* at 794–95.[9]

We see no reason to depart from the neutral principles approach which, as we have seen, passes constitutional muster.[10]

In *Waters v. Hargest*, 593 S.W.2d 364 (Tex.Civ.App.1979), the Texas court was confronted with a factual situation substantially similar to that in the instant case. There, a dispute arose between two factions of a (congregational) Baptist church. The plaintiffs instituted suit to compel the defendants, *inter alia*, to submit to a full financial report on the church's condition. The trial judge dismissed the case for lack of subject matter jurisdiction, claiming the suit concerned solely ecclesiastical matters. Citing *Jones v. Wolf, supra*, the appellate court ruled that the Texas courts did have jurisdiction to apply neutral principles of law in resolving disputes over the control of church property. The case was remanded for trial on questions involving contract and property rights.

Similarly, in *Abyssinia Missionary Baptist Church v. Nixon*, 340 So.2d 746 (Ala.1976), when former members of a (congregational) Baptist church brought suit seeking an accounting of church funds, the trial court dismissed on grounds that the plaintiffs had no standing, and, even assuming they did, that the court lacked jurisdiction to decide the matter. On appeal the Supreme Court of Alabama reversed, finding that the plaintiffs had standing and that the court possessed jurisdiction to resolve questions of civil or property rights. *Id.* at 748.

The North Carolina Supreme Court has held that where civil, contract, or property rights are involved in or arise from a church controversy, the civil tribunals have jurisdiction to apply neutral principles of law. *Atkins v. Walker*, 284 N.C. 306, 200 S.E.2d 641 (1973). Applying neutral principles of law, the court stated, means resolving questions using principles "applicable to the use of properties of an unincorporated athletic or social club." 284 N.C. at 319, 200 S.E.2d at 650. Where civil or property rights are involved, it has been said that the courts must take jurisdiction "to assure regularity of business practices and the rights of private use and ownership of property." *Church of God in Christ, Inc. v. Stone*, 452 F.Supp. 612, 616 (D.Kan.1976). Moreover, jurisdiction to apply neutral principles of law is particularly necessary in a congregational setting, as in the instant case, where there exists no hierarchical church tribunal to which the parties can turn for a decision. *See Clough v. Wilson*, 170 Conn. 548, 553, 368 A.2d 231, 234 (1976).

rule. 443 U.S. at 607–08, 99 S.Ct. at 3027–28. *See also Bouldin v. Alexander*, 82 U.S. (15 Wall.) 131, 21 L.Ed. 69 (1872). Any method of overcoming the majoritarian presumption is permissible so long as it does not impair free-exercise rights or entangle civil courts in matters of religious belief or doctrine. *Jones, supra*, 443 U.S. at 608, 99 S.Ct. at 3028. The *Jones* court noted, however, that the rule of majority representation could be overcome under the neutral principles approach. *Id.* at 607, 99 S.Ct. at 3027.

Our research has revealed several jurisdictions which appear to utilize the majority rule approach. *E.g., Abyssinia Missionary Baptist Church v. Nixon*, 340 So.2d 746 (Ala.1976); *Vogler v. Salem Primitive Baptist Church*, 415 S.W.2d 72 (Ky.1967); *Ables v. Garner*, 220 Ark. 211, 246 S.W.2d 732 (1952).

9. *See also Parent v. Roman Catholic Bishop of Portland*, Me., 436 A.2d 888 (1981).

10. This is in accord with numerous other jurisdictions. *See, e.g., Presbytery of Riverside v. Community Church of Palm Springs*, 89 Cal. App.3d 910, 152 Cal.Rptr. 854 (1979); *New Magnolia Baptist Church, Inc. of Branford v. Ellerker*, 353 So.2d 204 (Fla.App.1977); *Mount Zion Baptist Church v. Second Baptist Church of Reno*, 83 Nev. 367, 432 P.2d 328 (1967).

In sum, the neutral principles of law approach, being essentially secular in its operation, is the method least likely to interfere with the free exercise of religion. By utilizing neutral principles of law, we may treat religious organizations in the same manner as secular organizations, insofar as the adjudication of a property dispute is concerned. Such an approach satisfies the requirements of both the state and federal constitutions.

We conclude that the Superior Court erred in dismissing the second suit for lack of subject matter jurisdiction on grounds that the issues involved dealt solely with ecclesiastical matters. We note particularly that the complaint requested by way of declaratory relief "[t]hat the officers of said Church purportedly elected at the meeting of January 29 be made *to account for their handling of said Church's funds and property* ..." (emphasis added).[11] Should further proceedings consistent with this opinion be pursued, the Plaintiffs are entitled to present evidence in support of their demand for an accounting.[12]

In Docket No. CV–77–577 the entry will be:

Appeal and cross-appeal dismissed.

In Docket No. CV–78–178 the entry will be:

Appeal sustained.

Judgment vacated.

Remanded for further proceedings consistent with the opinion herein.

All concurring.

---

**11.** The Superior Court's dismissal for lack of jurisdiction was proper as to that portion of the Plaintiff's complaint requesting that the tenure of the Defendant, Pastor Wray, be declared terminated. Unless the question involves contractual rights, the tenure of a pastor is an ecclesiastical matter, not within the jurisdiction of the civil courts. Moreover, our Constitution vests in the congregational body the power to elect its own pastor:

> [A]ll religious societies in this State, whether incorporate or unincorporate, shall at all times have the exclusive right of electing their public teachers, and contracting with them for their support and maintenance. Me.Const. art. I, § 3. The term "public teachers" comprehends pastors of churches. *Master v. Second Parish of Portland*, 36

F.Supp. 918, 926 (D.Me. 1940), aff'd. 124 F.2d 622 (1st Cir. 1941).

**12.** Equitable jurisdiction for an accounting is vested in the Superior Court pursuant to 14 M.R.S.A. § 6051(13) which provides:

> The Superior Court shall have jurisdiction to grant appropriate equitable relief ... [a]nd have full equity jurisdiction, according to the usage and practice of courts of equity, in all other cases where there is not a plain, adequate and complete remedy at law.

The necessity for an accounting is a sufficient foundation for jurisdiction in equity. *Hall v. Penley Brothers Co.*, 9 F.Supp. 936, 940 (D.Me. 1935), *vacated on other grounds*, 84 F.2d 371 (1st Cir. 1936).